J-A15018-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| MICHAEL FRASER | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ROBERT G. O'BLACK AND LAURA M. | : | |
| O'BLACK | : | |
| | : | No. 1200 WDA 2022 |
| Appellants | : | |

Appeal from the Judgment Entered September 22, 2022
In the Court of Common Pleas of Westmoreland County Civil Division at
No(s):  15-CI-03034

BEFORE:   MURRAY, J., McLAUGHLIN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY McLAUGHLIN, J.:          **FILED: October 6, 2023**

Robert G. O'Black and Laura M. O'Black appeal from the judgment entered against them in this negligence action brought by Michael Fraser. The O'Blacks challenge the sufficiency and weight of the evidence, the court's admission of certain testimony, and the jury's award of damages. We vacate judgment and remand for the trial court to consider the O'Blacks' challenge to the weight of the evidence.

Fraser, a 21-year-old, attended a pool party at the O'Blacks' home in July of 2013. A round, inflatable raft was in the pool, one which the O'Blacks had purchased to be towed behind a boat. The raft was marked with a warning that stated, "Never allow diving onto this product." **See** Fraser's Trial Ex. 28.

---

[*] Retired Senior Judge assigned to the Superior Court.

The O'Blacks had placed a cover on the raft that concealed the warning label. They did not warn Fraser not to dive or jump onto the raft.

Fraser either dived or jumped from the diving board. He hit the raft and was propelled toward the shallow end of the pool. His head struck the cement and he suffered injuries that rendered him a quadriplegic. Fraser cannot recall the accident and does not know whether he dived head-first or jumped feet-first from the diving board, and whether he intended to hit the raft. Eyewitness accounts of the accident were somewhat inconsistent.

Fraser filed a complaint alleging, in relevant part, that the O'Blacks were negligent for permitting the raft to be placed in their pool and failing to warn him not to jump or dive onto it. The case proceeded to trial.

The jury found the O'Blacks 70% liable and Fraser 30% liable. It awarded damages of $19 million, including $9 million for future medical expenses, $3 million for pain and suffering, $3 million for embarrassment and humiliation, $3 million for loss of enjoyment of life, and $1 million for disfigurement. The court molded the verdict, pursuant to the finding of comparative negligence, to $13,300,000.

The O'Blacks filed post-trial motions, which the trial court denied. The court entered judgment against the O'Blacks,[1] and they appealed. They raise the following issues:

---

[1] Including delay damages and post-judgment interest, judgment was entered at $17,636,264.54.

I. Whether judgment n.o.v. or a new trial is required because [Fraser] was required to prove both that [the O'Blacks] knew or should have known that the raft was a dangerous condition, and that [Fraser] did not know or have reason to know of the danger, but [Fraser] proved neither.

II. Whether judgment n.o.v. or a new trial is required because [Fraser] failed to establish that [the O'Blacks'] alleged failure to warn him not to dive or jump on the raft caused his harm.

III. Whether a new trial is required because [Fraser] repeatedly introduced improper, self-serving, and highly prejudicial hearsay rumors suggesting that he was not responsible for the accident.

IV. Whether a new trial or remittitur is required because the jury's $9 million award for future medical expenses impermissibly exceeded the "total" for such expenses projected by [Fraser's] economic expert.

The O'Blacks' Br. at 7 (emphasis removed).

## I. Duty

### A. Motion for JNOV

The O'Blacks first argue that the trial court should have granted their post-trial motion for judgment notwithstanding the verdict ("JNOV") because Fraser failed to prove that they owed him a duty. They maintain this is so because Fraser did not show that they knew, or should have known, that the raft involved an unreasonable risk. They also argue that Fraser failed to prove that he did not know of the risk involved because the risk posed by diving or jumping onto a raft is obvious or recognizable to a reasonable person. They further claim the jury's finding that Fraser was contributorily negligent established that he understood the risk.

Review of the denial of JNOV presents a question of law. Thus, our standard of review is *de novo* and our scope of review is plenary. ***Bert Co. v.***

***Turk***, 257 A.3d 93, 109 (Pa.Super. 2021), *aff'd*, No. 13 WAP 2022, 2023 WL 4607874 (Pa. July 19, 2023); ***Betz v. Erie Ins. Exch.***, 957 A.2d 1244, 1262 (Pa.Super. 2008).

"A motion for JNOV challenges the sufficiency of the evidence presented at trial." ***Koller Concrete, Inc. v. Tube City IMS, LLC***, 115 A.3d 312, 321 (Pa.Super. 2015). JNOV is appropriate where either the movant is entitled to judgment as a matter of law or "the evidence was such that a verdict for the movant was beyond peradventure." ***Braun v. Wal-Mart Stores, Inc.***, 24 A.3d 875, 891 (Pa.Super. 2011) (citation omitted). In deciding a motion for JNOV, the court must consider the evidence in the light most favorable to the verdict winner. ***Id.*** at 890 (citation omitted). Review does not involve an assessment of the weight of the evidence or any conflicts therein. ***Koller Concrete, Inc.***, 115 A.3d at 321. JNOV is an "extreme remedy" that should only be granted in a clear case. ***Id.*** "If there is any basis upon which the jury could have properly made its award, the denial of the motion for [JNOV] must be affirmed." ***Braun***, 106 A.3d at 891 (citation omitted).

Section 342 of the Restatement (Second) of Torts outlines the duty of a possessor of land to licensees[2] for a condition on the land:

> A possessor of land is subject to liability for physical harm caused to licensees by a condition on the land if, but only if,
>
>> (a) the possessor knows or has reason to know of the condition and should realize that it involves an unreasonable

---

[2] The parties agree that Fraser, as a social guest, was a licensee. ***See*** Rest. (2d) Torts § 330.

> risk of harm to such licensees, and should expect that they will not discover or realize the danger, and
>
> (b) he fails to exercise reasonable care to make the condition safe, or to warn the licensees of the condition and the risk involved, and
>
> (c) the licensees do not know or have reason to know of the condition and the risk involved.

Restatement (Second) of Torts § 342 (1965); *see Sharp v. Luksa*, 269 A.2d 659 (Pa. 1970) (adopting Section 342). All three criteria must be present. *Hackett v. Indian King Residents Ass'n*, 195 A.3d 248, 252 (Pa.Super. 2018). For possessors or licensees to "know" of the risk posed by a condition, they must understand both "the chance of harm and the gravity of the threatened harm." Rest. (2d) of Torts § 342, comment a. Where reasonable minds could differ on these questions, they are to be decided by the jury. *Cf. Cresswell v. End*, 831 A.2d 673, 677 (Pa.Super. 2003).

A party moving for JNOV must have preserved the "particular point of contention" during trial. *See Kimble v. Laser Spine Inst., LLC*, 264 A.3d 782, 792 (Pa.Super. 2021) (*en banc*), *appeal denied*, 274 A.3d 722 (Pa. 2022). A defendant may preserve a claim that the plaintiff failed to present sufficient evidence of the relevant standard of care, by moving for a nonsuit on that basis. *See Mazzie v. Lehigh Valley Hosp. - Muhlenberg*, 257 A.3d 80, 87 (Pa.Super. 2021), *appeal denied*, 265 A.3d 205 (Pa. 2021).

Here, when the O'Blacks moved for nonsuit, their counsel argued,

> Your Honor, based upon the evidence that [Fraser] has put on, a nonsuit should be granted. [Fraser has] the burden of proving that the [O'Blacks] were negligent and that they were—and that their negligence was the cause of the accident.

> They have put on witnesses who were there at the time, all of whom have indicated that there was not roughhousing going on at the O'Black house that day. There was no history of it.
>
> There's no indication that there were no pool rules. There were pool rules as testified to by Mr. Reifschneider.
>
> So, the idea that the O'Blacks were somehow negligent in the way they maintained their pool just isn't supported by the evidence.
>
> With respect to the raft, the raft itself has no warning on it indicating that it cannot be used in pools. So there's no evidence that the raft should not have been used in the pool, and there's no evidence that any of this was the proximate cause of the happening of the accident.

N.T., 3/10/22, at 498-99.

Fraser's counsel responded that the O'Blacks could not move for nonsuit because they had presented evidence during Fraser's case-in-chief. ***But see*** Pa.R.C.P. 230.1(a)(2) (stating the court shall decide the motion by considering the plaintiff's evidence and any evidence favorable to the plaintiff that the defendant introduced during the plaintiff's case). The O'Blacks' counsel agreed with the assertion, responding, "That is what the law is, Your Honor." N.T., 3/10/22, at 499. The court denied the motion on this procedural basis without addressing the merits of the motion.

We find the O'Blacks waived the issue of whether they owed a duty to Fraser. They agreed that the court could not hear their motion for nonsuit. As the O'Blacks acquiesced to this ruling, they cannot complain of it on appeal.

Even if they had not committed waiver, we would find the motion for non-suit only preserved the issue of whether there was sufficient evidence that the raft involved an unreasonable risk and the O'Blacks' had knowledge

- 6 -

thereof.[3] The O'Blacks did not attempt to argue in their motion for nonsuit that there was insufficient evidence that, if the raft constituted an unreasonably dangerous condition, **Fraser** knew or should have known of the risk because it was obvious to a reasonable person or because Fraser had personal knowledge of the risk of danger.

We would further find the argument the O'Blacks did make meritless. Fraser presented sufficient evidence that the raft involved an unreasonable risk and the O'Blacks knew or should have known it. Fraser presented an expert on "product safety and evaluation of written warnings." *See* N.T., 3/9/22, at 357. The expert testified that, although the label warned against "diving" onto the raft, that term referred broadly to the act of plunging into the water, including "jumping." *Id.* at 373-74. He stated that if one either dived or jumped on the raft, "[w]hatever posture you assume, there's a good chance you're going to bounce off." *Id*. at 375. He continued,

> That's exactly why that warning is on there. Because you can't control what you're going to do once you hit that device, whether you jump on to your buttocks or you jump on to your feet. However. Or land on your belly on it. You really can't control what happens after that. That's what makes it dangerous. That's why the label is there, the warning. . . .

_____

[3] The O'Blacks' motion for non-suit raised whether Fraser had failed to present evidence that the raft should not have been in the pool because the warning label did not state it could not be used in a pool. In other words, they argued that, as evidenced by the terms of the warning label, the raft's placement in the pool did not pose an unreasonable risk of harm, and/or that because of the terms of the warning label, the O'Blacks did not know or have reason to know the raft posed an unreasonable risk of harm.

> So the raft itself really creates a dangerous condition all by itself. And the warning labels do speak of it. So when you -- the rings in the feature -- you can see there's multiple rings on the inflatable. When person impacts that, you can go off in different directions. You can also poorly place yourself and end up on the side, which would cause you to shoot off in one direction. If you could land perfectly in the middle and there's no other issues, maybe you could pull it off okay, but think the risk -- I believe that the risk of potential injury is too high with a device like this. That comports with what the warnings have on it as well.

*Id.* at 375, 378-79.

The O'Blacks testified that they read the warning label instructing the owner of the raft to forbid diving onto it. N.T., 3/7/22 & 3/8/22, at 289-90; N.T., 3/9/22, at 310-11, 317. Laura O'Black testified that had she been by the pool, she would not have allowed anyone to dive head-first onto the raft. N.T., 3/7/22 & 3/8/22, at 290. Robert O'Black also testified that he was aware that when a person jumps on a raft, it might come out from underneath them, and the person could land in the water "all sorts of ways." *Id.* at 324.

Viewed in the light most favorable to Fraser, the verdict-winner, this testimony was sufficient for the jury to find that the raft posed an unreasonable risk to anyone who might either dive or jump onto it, and that the O'Blacks were aware of the risk. The jury was entitled to make this factual finding and disregard any evidence to the contrary. Although the warning label only specified there was danger in "diving" onto the raft, the parties contested the meaning of this term, and the O'Blacks' understanding of it, and the jury was free to resolve the question based on the testimony.

**B. Motion for a New Trial**

The O'Blacks argue the court erred in denying their motion for a new trial because the verdict was against the weight of the evidence about whether they owed a duty to Fraser regarding the raft. They argue there was "overwhelming evidence that [they] lacked the knowledge required for them to warn of a danger." O'Blacks' Br. at 21. They alternatively argue the evidence established that Fraser knew of the risk, because the expert testimony conclusively established that the danger posed by the raft was obvious.

The trial court denied the motion for a new trial because the O'Blacks "failed to raise the issue of an alleged lack of duty on the part of the [O'Blacks] at any point during the trial." Trial Court Opinion, filed 9/14/22, at 5. The O'Blacks argue that they did not waive their weight challenge because such a claim need not be raised until the completion of trial.

We agree with the O'Blacks that they have not waived this issue. They argued these points at trial, and a challenge to the weight of the evidence may be raised for the first time in a timely post-verdict motion. ***Criswell v. King***, 834 A.2d 505, 513 (Pa. 2003); ***accord Haan v. Wells***, 103 A.3d 60, 68 (Pa.Super. 2014).

However, unlike a challenge to the sufficiency of the evidence, we review a challenge to the weight of the evidence for an abuse of discretion on the part of the trial judge, who must pass on the weight claim in the first instance. ***Getting v. Mark Sales & Leasing, Inc.***, 274 A.3d 1251, 1260 (Pa.Super.

2022), *reargument denied* (June 14, 2022). Here, as the trial court erroneously found waiver, it did not consider whether the verdict against the O'Blacks was contrary to the weight of the evidence regarding whether the O'Blacks had a duty to Fraser regarding the raft. We will therefore remand for the trial court to consider this issue in the first instance.

## II. Causation

### A. JNOV

The O'Blacks argue that the court erred in denying their motion for JNOV because Fraser presented insufficient evidence of causation. The O'Blacks contend that to prove causation, Fraser needed to prove both that he had intended to dive or jump onto the raft and that he would not have done so if the O'Blacks had warned him it was dangerous. They further argue Fraser had to prove that he was injured after he dived head-first onto the raft, rather than jump feet-first. In their view, this is so because otherwise a warning not to "dive" onto the raft, which was the only danger of which the O'Blacks claim they may have had knowledge, would not have prevented his injuries. They assert that Fraser's failure to prove exactly how the accident happened is fatal to his ability to prove causation.

As stated above, we find that the O'Blacks waived all issues for JNOV by agreeing that the court could not hear their motion for nonsuit. Furthermore, when the O'Blacks brought their motion for nonsuit, their counsel argued only that "there's no evidence that any of this was the proximate cause of the happening of the accident." N.T., 3/10/22, at 498-99. Counsel's statement of

"any of this" referred to the immediately preceding assertion that "there's no evidence that the raft should not have been used in the pool" or that the pool was unsafe due to roughhousing or lack of rules. **See id.** Thus, counsel only argued there was insufficient evidence that the use of the raft in the pool or the activities at the pool was the proximate cause of Fraser's injuries. This is notably different than the instant claim that there was insufficient evidence that Fraser intentionally dived head-first into the raft, rather than accidentally or feet-first, or was generally a "rule-follower." Their instant arguments are therefore waived for this reason, as well.

Even if they were not waived, we would find them meritless. The trial court denied JNOV because it found that Fraser was not required to prove that he would have changed his behavior pursuant to a warning. The court noted this standard is only imposed in products liability cases, rather than in a negligence case against a possessor of land.

We agree. In a products liability case based on a claim of inadequate or lack of warning, the plaintiff must prove "that the user of the product would have avoided the risk had he or she been warned of it." **French v. Commonwealth Assocs., Inc.**, 980 A.2d 623, 632 (Pa.Super. 2009) (citation omitted). We decline to extend this requirement to premises liability, which only requires proof that the dangerous condition the possessor failed to rectify or warn the licensee of caused the licensee's injuries. **See** Rest. (2d) of Torts § 342. Moreover, a licensee need not establish whether he encountered the dangerous condition accidentally or with intention. Instead,

- 11 -

liability of the possessor turns on whether the licensee "[did] not know or have reason to know of the condition and the risk involved." ***Id.***[4]

The issue of whether there was sufficient evidence that Fraser dived head-first into the raft, rather than jumped feet-first, has been further waived by the O'Blacks' failure to include it in their motion for JNOV. There, the O'Blacks only challenged the sufficiency of the evidence to support a finding of causation based on whether Fraser would have heeded a warning and whether he had dived or jumped onto the raft intentionally. Supplemental Motions for Post-Trial Relief, 4/27/22, at 3. The O'Blacks did not raise the distinction between diving head-first and jumping feet-first.[5]

### B. Weight of the Evidence

As they do in their JNOV argument, the O'Blacks argue the verdict was against the weight of the evidence about whether their failure to warn Fraser caused his harm. They assert the evidence was inconclusive as to whether Fraser would have followed any warning and as to whether he intentionally dived head-first onto the raft, which was, they argue, the only action a warning not to "dive" might have prevented.

---

[4] We note, nonetheless, that the evidence was sufficient for the jury to conclude that Fraser intentionally dived or jumped onto the raft.

[5] Regardless, one of the witnesses testified that Fraser sustained his injuries after diving head-first onto the raft. ***See*** N.T., 3/8/22, at 199, 203. There was therefore sufficient evidence for a jury to conclude that Fraser dived head-first, and that the risk of danger posed by using the raft in this manner caused Fraser's injuries.

The trial court did not address this claim aside from rejecting the argument that Fraser needed to prove he would have heeded a warning from the O'Blacks. Because we agree that Fraser was not required to prove that he would have heeded a warning from the O'Blacks, the challenge to the weight of the evidence on this point is meritless. We reach the same conclusion as to evidence that Fraser intentionally availed himself of the dangerous condition, as this is not a prerequisite to a finding of causation.

Finally, the O'Blacks waived the issue of whether the weight of the evidence contradicted a conclusion that Fraser dived head-first onto the raft, rather than jumped feet-first. In their post-trial motion, the O'Blacks argued the verdict was against the weight of the evidence about whether Fraser would have heeded a warning and whether he had dived or jumped onto the raft intentionally. Supplemental Motions for Post-Trial Relief at 3. The O'Blacks did not raise the distinction between diving head-first and jumping feet-first.

## III. Hearsay

In their third issue, the O'Blacks argue the court erred in overruling their objections to alleged hearsay testimony given by Fraser and Laura O'Black. They further argue the court erred in denying their motion for a new trial on this basis.

"Trial courts have broad discretion to grant or deny a new trial." *Flenke v. Huntington*, 111 A.3d 1197, 1199 (Pa.Super. 2015). We review both a trial court's evidentiary rulings and its decision on a motion for a new trial under an abuse of discretion standard. *Id.* at 1199, 1200.

On direct examination, Fraser's counsel questioned him about his inability to recall how the accident occurred, and the existence of multiple versions of the accident. The O'Blacks objected. Counsel asserted that this testimony was relevant to Fraser's "emotional damage." N.T., 3/8/22, at 120-21. The court overruled the objection and allowed Fraser to testify that hearing multiple stories about the accident disturbed him because "if you don't know how something happened, you have no reference point." *Id*. at 121-22.

On cross-examination, the O'Blacks pointed out that Fraser had the benefit of hearing how the accident happened from eyewitnesses Max Wilkin and Adam Reifschneider, whose testimony had already been introduced:[6]

> Q. You had indicated that you were -- one of the things that makes it difficult for you is that you don't know what happened to you, correct?
>
> A. Correct.
>
> Q. And are you aware that Max Wilkin gave sworn testimony six months ago in which he said exactly what happened?
>
> A. I don't know.
>
> Q. You were never shown that?
>
> A. No.
>
> Q. You have no idea what he said?
>
> A. No.
>
> Q. Did you ever talk to Max at any point after this to find out what he knew?
>
> A. I don't think I talked to anybody specific -- I don't think so.

---

[6] Max Wilkin testified via a deposition. *See* N.T., 3/10/22, at 548.

Q. Did you talk to Adam Reifschneider about what he saw?

A. I don't remember having conversation with anybody about that day.

Q. Well, you agree that those two were in the pool with you, right?

A. That's what remember.

Q. And wouldn't they be the first persons that you would look to try and figure out what happened to you?

A. I mean, haven't spoken to lot of people in long time.

Q. I understand. You had said you heard from various people. You had heard things that just didn't make any sense. I'm just wondering that those two were right there. Did you ever go to them and say, hey, can you tell me what happened?

*Id.* at 169-70.

The O'Blacks also cross-examined Fraser as to the veracity of the substantive content of Wilkin's and Reifschneider's testimony, which Fraser disputed:

Q. And Mr. Wilkin has testified that he said to you ten or 15 seconds before this incident occurred, ["]I bet you won't jump off the diving board and on to the raft.["] Or words to that effect. Do you recall that?

A. No.

Q. And because you don't have any recollection of that, you can't disagree with what Mr. Wilkin said?

A. I mean, I can only go based off of me.

Q. Well, and you – you have no recollection, right?

A. No, but I didn't have a history of doing –

Q. I'm not asking you about your history. I'm asking you about your recollection from that time. And you don't – You're telling us you don't have any recollection of having a conversation with Mr. Wilkin ten or 15 seconds prior to this incident?

A. No. I don't have recollection of that conversation.

Q. Do you have a recollection of accepting that challenge and saying, ["]I can["] or ["]I will["]? . . .

Q. And based upon your personal recollection then, you can't disagree with what Mr. Wilkin's version of what occurred?

A. I don't remember, so I can't.

Q. Right. And do you have recollection of after that getting up on to the diving board?

A. The last thing remember is just seeing my feet at the board.

Q. Okay. Do you have recollection of saying when you were up there on the diving board, ["]I'm going to dive on to this raft["]?

A. No, I don't think I did.

Q. Are you aware that Adam Reifschneider who was there has testified under oath that that's the exact thing you said?

A. No.

Q. And are you denying what he said? Are you saying it's untrue?

A. I'm saying that all I can base everything off of –

Q. Well, let's base it off your personal recollection, what you actually recall, not what you think you might have done based on your personality. Just your personal recollection.

A. So all that I can do, though, with no memory, is to base it off of my – base it off the past.

Q. Well, I'm asking you to limit it to your memory. I think it's a simple question, which is if you don't have any memory of being up there on the board and saying something, you can't agree or disagree with what Mr. Reifschneider said?

*Id.* at 178-81.

On redirect examination, Fraser's counsel asked him if he was aware of any other theories of how the accident happened, in addition to the explanations Wilkin and Reifschneider gave in their testimony, and what those theories were:

Q. You recall [defense counsel] asking you a series of questions, many questions, about things that other people said you did on the diving board?

A. Just now?

Q. Yeah.

A. Yeah.

Q. And, in fact, [defense counsel] asked you if you heard about testimony that Adam Reifschneider gave. Do you remember those questions?

A. Yeah.

Q. And he asked you if you were aware of testimony that Max Wilkin gave about what it was that you were doing in the moments leading up to your departure from the diving board. Do you remember those questions?

A. Yes.

Q. So, those were two examples that [defense counsel] gave you of explanations for what you were doing at the time that you left the diving board, right?

A. Right.

Q. Are you aware of any others?

N.T., 3/8/22, at 190-91. The O'Blacks objected, and the court overruled the objection. Fraser then testified:

[Fraser]: I've heard the—I've heard it's possible the raft was pushed at me.

[Plaintiff's counsel:] That what was pushed at you?

A. The raft was.

Q. In other words, that the raft was pushed in front of you and that you didn't know or expect it to be there when you jumped?

A. That's one of the things I've heard.

Q. Have you heard anything else?

A. Not that I can remember.

*Id.* at 191.

Fraser also presented the testimony of Laura O'Black and examined her as on cross. His counsel asked her if she had heard "a story" that someone had pushed the raft in front of Fraser:

> Q. So, as you talked to people, did you gain an understanding of what the potential possibilities were as to how this accident could have occurred?
>
> A. Not really.
>
> Q. Was there a –- was there a story floating around that someone may have either pushed the raft --.

*Id.* at 278-79. The O'Blacks objected, and the court overruled the objection.

The testimony proceeded:

> Q. Ma'am, was there a story floating around that one of the boys either pushed or pulled the raft out of [Fraser's] path when he was jumping off the diving board?
>
> A. Yes.

*Id.* at 279.[7]

---

[7] We note Fraser elicited testimony regarding the rumor that someone pushed the raft in front of Fraser from a third witness, Austin O'Black:

> Q. You did hear there were other stories, correct?
>
> A. Numerous.
>
> Q. We heard one today somebody may have pushed a raft in front of [Fraser], right?
>
> A. Correct.

*(Footnote Continued Next Page)*

In its opinion, the court stated it overruled the objections because it found the O'Blacks had opened the door to the subject of the witnesses' understanding that there were a variety of accounts as to how the accident occurred. Trial Ct. Op. at 9. Fraser contends that the testimony was not hearsay, because it was not offered for its truth, but to prove that there were multiple versions of the accident.

The O'Blacks argue that the testimony that someone may have pushed the raft in front of Fraser was hearsay. They argue these were out-of-court statements that were offered to prove that Fraser had not intended to hit the raft. They maintain that their cross-examination of Fraser did not open the door to hearsay about how else the accident might have happened, because their questions went to testimony that had already been introduced to the jury.

Even assuming the court erred in overruling the hearsay objections, the error was harmless. "The harmless error doctrine underlies every decision to grant or deny a new trial," and therefore, "[a]n erroneous evidentiary ruling does not warrant a new trial unless it was harmful or prejudicial to the complaining party." *Flenke*, 111 A.3d at 1199, 1200. "A party suffers

---

Q. But you never heard that version of the story from [Fraser], correct?

A. No.

N.T., 3/8/22, at 259-60. The O'Blacks did not object to this questioning.

prejudice when the trial court's error could have affected the verdict." ***Reott v. Asia Trend, Inc.***, 7 A.3d 830, 839 (Pa.Super. 2010).

The O'Blacks argue that the testimony was prejudicial because it was the only evidence suggesting that Fraser landed on the raft accidentally. They assert it may have affected the verdict by reducing the jury's finding of Fraser's comparative negligence.

We find that any error in this regard was harmless. The testimony was *de minimis* in comparison to the testimony that Fraser had intended to land on the raft. In addition to Wilkins and Reifschneider, a third witness, Jon Szuch, told the jury that Fraser had intended to dive or jump onto the raft. No eyewitness testified to the contrary. Furthermore, the testimony at issue was a report of a mere "story floating around" or a rumor, and neither Fraser nor Laura O'Black identified a source, and neither of them attested that this was how the accident occurred. We are convinced that this brief, unsubstantiated testimony did not impact the verdict. The court did not abuse its discretion in denying the O'Blacks' motion for a new trial.

## IV. Damages

In their final issue, the O'Blacks argue that the court erred in denying their post-verdict motion for a new trial or a remittitur, because they claim the evidence did not support the jury's award of $9 million in future medical expenses. They assert that Fraser's life care planning expert, Versha Desai, R.N., testified that Fraser's total future medical costs would be between $7.8 and $8.1 million, as stated in her most recent life care plan. They note that

Nurse Desai authored two other life care plans that were submitted to the jury, one of which projected future costs as exceeding $9 million. However, the O'Blacks add, she testified that that estimate had not included information she later received from Fraser's treating physician, Dr. John A. Horton, M.D, lowering Fraser's life expectancy.[8] The O'Blacks assert that the jury should not have been permitted to speculate regarding the amount of economic damages and should have been restricted to awarding future medical expenses based on Nurse Desai's final report. They also point out Fraser argued to the jury that they should base his future medical expenses on Dr. Horton's projection of his life expectancy.

We review a trial court's decision on a motion for a new trial on damages or remittitur for an abuse of discretion. *See Mazzie v. Lehigh Valley Hosp. - Muhlenberg*, 257 A.3d 80, 91 (Pa.Super. 2021), *appeal denied*, 265 A.3d 205 (Pa. 2021); *Gunn v. Grossman*, 748 A.2d 1235, 1241 (Pa.Super. 2000). It is within the jury's province to calculate damages, and a court should not disturb a jury's finding unless "it clearly appears that the amount awarded resulted from caprice, prejudice, partiality, corruption or some other improper influence." *Paves v. Corson*, 801 A.2d 546, 549 (Pa. 2002) (citation omitted). A damages award "need only bear a reasonable relationship to the loss suffered by plaintiff[;] . . . precise mathematical certainty is not

---

[8] The O'Blacks also argue the first two life care plans were hearsay. However, they did not include any such challenge in their Statement of Questions Involved. It is therefore waived.

- 21 -

required[.]" ***Mader v. Duquesne Light Co.***, 241 A.3d 600, 617 (Pa. 2020) (internal quotation marks and citation omitted). As with evidence of liability, jurors are free to believe all, part, or none of the evidence as to damages. ***Id.*** at 612.

The court found the jury was entitled to base the award on Nurse Desai's earlier estimate for future medical expenses or any other relevant information in the life care plans:

> A review of the trial transcript shows that all three life care plans provide significant information in addition to her changing estimates, and all three plans were reviewed extensively at trial during [Nurse] Desai's testimony. This testimony included a lengthy explanation as to why her future medical expense estimate figures fluctuated over time. . . .
>
> After extensive testimony on the subject of the life care plans, the jury was fully informed of what information the plans contained and what this information meant.

Trial Ct. Op. at 17 (citation to trial deposition omitted).

The court also found the jury could have properly considered Nurse Desai's testimony that there might be future medical expenses that were not contemplated in her life care plans, as well as Dr. Horton's testimony that Fraser's life expectancy might be improved by medical advances. ***Id.*** The court concluded, "Because the jury was provided with a significant amount of evidence regarding [Fraser's] future medical expenses, including *but not limited to* Nurse Desai's life care plans, the jury's verdict was not unreasonable under the law." ***Id.*** at 18 (emphasis in original).

We discern no abuse of discretion. Nurse Desai explained how she reached her projections for Fraser's medical care, which depended on several variables, such as Fraser's life expectancy. The jury was free to believe all, part, or none of the evidence substantiating these variables, including Dr. Horton's projection of Fraser's life expectancy. The jury's award bore a reasonable relationship to Nurse Desai's calculations. We therefore may not disturb it.

Judgment vacated. Case remanded with instructions. Jurisdiction relinquished.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

DATE: <u>10/6/2023</u>